# United States Court of Appeals
## For the First Circuit

---

No. 24-1509

AMBER LAVIGNE,

Plaintiff, Appellant,

v.

GREAT SALT BAY COMMUNITY SCHOOL BOARD; SAMUEL ROY, in his
official capacity as a social worker at Great Salt Bay Community
School; KIM SCHAFF, in her official capacity as the principal of
the Great Salt Bay Community School; LYNSEY JOHNSTON, in her
official capacity as the superintendent of the schools of
Central Lincoln County School System; and JESSICA BERK, in her
official capacity as a social worker at Great Salt Bay Community
School,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

---

Before

Montecalvo, Howard, and Aframe,
Circuit Judges.

---

Adam Shelton, with whom John Thorpe and Scharf-Norton Center
for Constitutional Litigation at the Goldwater Institute were on
brief, for appellant.

Melissa A. Hewey, with whom Susan M. Weidner and Drummond
Woodsum were on brief, for appellees.

Katherine L. Anderson, David A. Cortman, Vincent M. Wagner,
Glynis R. Gilio, and Alliance Defending Freedom on brief for Tammy

Fournier, amicus curiae.

Mary E. McAlister, Vernadette R. Broyles, and Child & Parental Rights Campaign, Inc., on brief for Child & Parental Rights Campaign, Inc., amicus curiae.

Alan Wilson, Attorney General of South Carolina, Robert D. Cook, Solicitor General, J. Emory Smith, Jr., Deputy Solicitor General, Thomas T. Hydrick, Assistant Deputy Solicitor General, Joseph D. Spate, Assistant Deputy Solicitor General, and State of South Carolina Office of the Attorney General on brief for South Carolina, Alaska, Georgia, Idaho, Iowa, Kansas, Louisiana, Missouri, Nebraska, North Dakota, South Dakota, and West Virginia, amici curiae.

---

July 28, 2025

---

**MONTECALVO**, <u>**Circuit Judge**</u>. Plaintiff Amber Lavigne initiated this lawsuit against the Great Salt Bay Community School Board (the "Board") and various individual members of the school staff[1] (together, "defendants"), alleging that defendants infringed on her constitutional right to parent. Lavigne claims that defendants acted unconstitutionally by providing her child, A.B., a chest binder -- "a device used to flatten a female's chest so as to appear male" -- and referring to A.B. by a name and set of pronouns different from those given to A.B. at birth without telling Lavigne, adhering to what Lavigne alleges is a school-wide policy of withholding such information. We now consider whether the district court correctly determined that the Board could not be held liable for the alleged constitutional violations. For the reasons explained below, we agree with the district court that Lavigne has not plausibly alleged that the Board had a custom or policy in place of withholding this type of information and,

---

[1] For reasons more fully explained later, <u>see</u> <u>infra</u> Part I.B., the district court dismissed the claims against defendants Samuel Roy, a social worker at the school; Jessica Berk, another social worker; Kim Schaff, the school principal; and Lynsey Johnston, the district superintendent. Lavigne's Notice of Appeal in this case lists that order of dismissal as one which she appeals, but she does not raise any argument relevant to that order in her briefing. Accordingly, to the extent she seeks to raise any error with respect to that decision, any such claim is waived. <u>See</u> <u>United States</u> v. <u>Mayendía-Blanco</u>, 905 F.3d 26, 32 (1st Cir. 2018) ("[I]t is a well-settled principle that arguments not raised by a party in its opening brief are waived." (citing <u>Landrau-Romero</u> v. <u>Banco Popular de P.R.</u>, 212 F.3d 607, 616 (1st Cir. 2000))).

- 3 -

accordingly, affirm the district court's decision granting the Board's motion to dismiss.

## I. Background

### A. Facts

We draw the relevant facts from Lavigne's complaint, "accept[ing] the well-pleaded facts . . . as true and draw[ing] all reasonable inferences in [Lavigne's] favor." Torres-Estrada v. Cases, 88 F.4th 14, 19 (1st Cir. 2023) (citing Núñez Colón v. Toledo-Dávila, 648 F.3d 15, 19 (1st Cir. 2011)).

### 1. Underlying Conduct

A.B. started at Great Salt Bay Community School ("Great Salt"), a kindergarten through eighth grade school, in 2019, and, initially, Lavigne was "generally pleased" with the education A.B. received. However, in December 2022, when A.B. was thirteen, Lavigne and A.B. were cleaning A.B.'s room when Lavigne discovered a chest binder, which the complaint defines as "a device used to flatten a female's chest so as to appear male." A.B. told Lavigne that defendant Samuel Roy, a school social worker, provided the chest binder and instructed A.B. on how to use it. Lavigne also alleges that, on the same day, Roy gave A.B. a second chest binder and informed A.B. that "he was not going to tell A.B.'[s] parents . . . and A.B. need not do so either." Lavigne was never informed that A.B. would be or had been given a chest binder and taught how to use it.

- 4 -

Around the same time, Lavigne learned that, at school, A.B. was using a name and pronouns different from those given to A.B. at birth. But the school never told Lavigne that A.B. was using a different name and pronouns from those used at home. Lavigne alleges that defendants "withheld and concealed" the information about the chest binders and A.B.'s use of a different name and pronouns "pursuant to a blanket policy, pattern, and practice of withholding and concealing information respecting 'gender-affirming' treatment of minor children from their parents." She further alleges that there is no policy or procedure allowing parents to provide input regarding a student's decision to use "a different name and pronouns" at school.

### 2. Lavigne Brings Concerns to Great Salt's Attention

#### a. Meeting with Great Salt Principal and School Superintendent

Shortly after discovering the chest binder, Lavigne met with defendants Principal Kim Schaff and Superintendent Lynsey Johnston. Both "expressed sympathy . . . and concern that th[e] information had been withheld and concealed." Two days later, Superintendent Johnston "explained that no policy had been violated by the giving of chest binders to A.B.[] or by school officials . . . employing a different name and pronouns." Soon after, Lavigne withdrew A.B. from Great Salt, citing its "policy, pattern, and practice of withholding and concealing of crucially

important and intimate psychosexual information about her minor child."

### b. Great Salt's Written Policies

According to Lavigne, the school pointed to several written policies as supporting defendants' actions, specifically Great Salt's Transgender Students Guidelines (the "Guidelines") and the Staff Conduct with Students Policy ("Staff Conduct Policy").

The Guidelines provide, in relevant part, that:

- Their purpose is "[t]o foster a learning environment that is safe[] and free from discrimination, harassment and bullying."

- They "are not intended to anticipate every possible situation that may occur, since the needs of particular students and families differ depending on the student's age and other factors. In addition, the programs, facilities and resources of each school also differ. Administrators and school staff are expected to consider the needs of students on a case-by-case basis, and to utilize these guidelines and other available resources as appropriate."

- In addressing needs raised by a transgender student, the school should, among other steps, develop a plan "in consultation with the student, parent(s)/guardian(s) and others as appropriate."

The Guidelines do not include any provision directing school staff to withhold information from transgender students' parents or guardians. Lavigne alleges in her complaint that the Guidelines are "silent with respect to the giving of chest binders or any other devices with or without the involvement or consent of

parents" and "do not mandate the involvement of parents at any point in the process of deciding whether to use alternate names and pronouns."

The only relevant provision of the Staff Conduct Policy is an explicit prohibition on staff asking students to keep secrets.

### c. Board Meeting

In late December 2022, Lavigne spoke at a Board meeting about these incidents. In her statement to the Board, Lavigne "detailed the trust that had been broken by [d]efendants withholding and concealing vitally important information from her respecting her minor child's psychosexual development and stated that the 'decisions made [by Great Salt] drove a wedge between'" A.B. and Lavigne.

### d. Great Salt Statements

The Board did not respond to Lavigne during the Board meeting but later released two separate statements. Great Salt's principal also released a statement.

### i. The Board's First Statement

In the first statement, issued shortly after the meeting, the Board explained that it was unable "to discuss confidential student and staff information" but emphasized that its "first priority is always to provide a safe, welcoming and inclusive educational environment for all students and staff" and

that it "has specific policies and procedures in place that must be followed" when addressing student and parent concerns.  It also emphasized that its "policies comply with Maine law, which protects the right of all students and staff, regardless of gender/gender identity, to have equal access to education, the supports and services available in [Great Salt Bay area] schools, and the student's right to privacy regardless of age."  The statement did not explicitly address Lavigne, A.B., or any member of Great Salt staff.

### ii. The Board's Second Statement

In the second statement, issued in January 2023, the Board addressed recent bomb threats made to the school, explaining that a "grossly inaccurate and one-sided story" gave rise to the threats.  The Board again emphasized its obligation to maintain confidentiality of students and staff but explained that "[t]hose promoting th[e] false narrative are apparently disturbed by [Great Salt's] ongoing and steadfast commitment to providing all students with safe and equal access to educational opportunities without discrimination."  The Board then cited several Maine laws as providing students the right to access mental health services without parental consent, see Me. Rev. Stat. Ann. tit. 22, § 1502 ("a minor may consent to treatment for substance use disorder or for emotional or psychological problems"), and the right to confidential counseling with school-based mental health service

- 8 -

providers, see id. tit. 20-A, § 4008.   Finally, the statement explained that "neither the Board nor school administration [was] aware of any violation of policy or law which requires further action."

### iii. Principal's Statement

Great Salt Principal Schaff then issued a statement in February 2023, primarily addressing ongoing threats against Great Salt and its staff.  Principal Schaff explained that, under Maine law, "a school counselor or school social worker may not be required, except as provided by [law], to divulge or release information gathered during a counseling relation with a client or with the parent, guardian[,] or a person or agency having legal custody of a minor client."  As Lavigne alleges, the statement "offered no explanation of how the giving of a chest compression device or the employment of alternate names and pronouns constitutes 'information gathered.'"  That statement did not mention A.B., Lavigne, or any facts relevant to A.B. and did not discuss or allude to Great Salt policies.

### e. Post-Lawsuit Developments

Finally, following the filing of this lawsuit, the Board unanimously approved a second-year contract term for Roy, the school social worker who provided the chest binders to A.B.[2]

---

[2] Lavigne did not include this fact in her original complaint and did not file an amended complaint to include it.  Instead, she

### B. Procedural History

In April 2023, Lavigne filed suit against the defendants, pursuant to 42 U.S.C. § 1983, alleging that the defendants' actions to conceal the chest binders and A.B.'s alternative name and pronouns used at school violated Lavigne's substantive due process rights as a parent "to control and direct [A.B.'s] education and general upbringing." Lavigne also alleged the defendants violated her procedural due process rights by denying her the ability to participate in the decision-making process regarding A.B.'s gender-identity expression at school. She also advanced claims against the individual defendants and a municipal liability claim against the Board.

Defendants moved to dismiss, arguing that (1) the claims against the individual defendants in their official capacities were "redundant" because these claims were captured by Lavigne's municipal liability claim; (2) the municipal liability claim failed because Lavigne had alleged no facts establishing the alleged unconstitutional acts were caused by an institutional policy or custom; and (3) even assuming Lavigne had alleged the existence of such a policy, the defendants' actions did not violate

---

introduced this fact in her response to the motion to dismiss, asking the district court to take judicial notice of it. She asks the same of us. Given our ultimate disposition of this case, we assume without deciding that we may take judicial notice of this fact.

Lavigne's constitutional rights.  In response, Lavigne contended that (1) retaining named individual defendants is permitted in municipal liability cases because it provides plaintiffs with "a better opportunity to prove [their] case"; (2) her allegations established that the defendants' acts were pursuant to a policy or custom of withholding information from parents and were ratified by the Board, either of which could establish municipal liability; and (3) she had alleged resulting constitutional violations.

After a short hearing on the motion to dismiss, the district court granted the motion as it related to the named individuals, the two social workers, the Great Salt principal, and the district superintendent, supra note 1, as Lavigne was not seeking any relief from them and obtaining their testimony "should not be a problem."  The district court took the remainder of the motion under advisement.

Later, the district court issued a written decision granting the motion to dismiss with respect to the Board, determining that Lavigne had failed to plausibly show municipal liability.  To begin, the district court explained that, because all of Lavigne's claims "center[ed] on" her right to not have information withheld pursuant to a withholding policy, the success

of her suit hinged on whether she had properly alleged the existence of such a withholding policy.[3]

In its decision, the district court focused on the second element of municipal liability -- whether a municipality is itself responsible for the alleged constitutional violation -- concluding that the complaint did not allege facts that could plausibly support liability.  Specifically, the district court determined that Lavigne was required to show that the Board's "policy or custom [wa]s responsible for causing the constitutional violation," and so it concentrated its inquiry on whether Great Salt had a policy or custom of withholding information.  (Quoting Abdisamad v. City of Lewiston, 960 F.3d 56, 60 (1st Cir. 2020)). The district court found that Lavigne had not plausibly alleged that the so-called "withholding policy" was a settled custom or practice at Great Salt because she relied on "conclusion[s] unsupported by factual allegations."  The court also determined that Lavigne could not satisfy municipal liability by ratification because Great Salt's statements were too vague to constitute active approval of the individual defendants' withholding of information.

---

[3] In their briefing on the motion to dismiss, the parties treated Lavigne's substantive due process claim as a § 1983 municipal liability claim but treated her procedural due process claim as a standalone claim not tethered to any liability framework.  On appeal, Lavigne appears to have abandoned her procedural due process claim, only addressing her substantive due process argument.  We therefore deem any due process claim waived. See Mayendía-Blanco, 905 F.3d at 32.

Accordingly, the district court dismissed Lavigne's complaint, and she timely appealed.

## II. Standard of Review

"We review the district court's grant of [the] motion to dismiss de novo." Wadsworth v. Nguyen, 129 F.4th 38, 61 (1st Cir. 2025) (cleaned up) (quoting Torres-Estrada, 88 F.4th at 23).  To assess whether a complaint can withstand a Rule 12(b)(6) motion, we "must accept as true all well-pleaded facts 'indulging all reasonable inferences in [appellant's] favor.'" Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009) (quoting Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006)).  Our federal pleading standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  And, importantly, "assertions nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint" are insufficient to state a cognizable claim.  Menard v. CSX Transp., Inc., 698 F.3d 40, 45 (1st Cir. 2012).

Accordingly, "we will not accept a complainant's unsupported conclusions or interpretations of law." Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 971 (1st Cir. 1993) (citing United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992)).  But "[b]ecause a dismissal terminates an action at the

earliest stages of litigation without a developed factual basis for decision, we must carefully balance the rule of simplified civil pleading against our need for more than conclusory allegations." Id.

### III. Discussion

Municipalities cannot be held liable for the conduct of their employees unless the municipality itself is also responsible in some way for that conduct. See Monell v. Dep't of Soc. Servs. of N.Y., 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor -- or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). As the Supreme Court has explained, "[a] municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." Connick v. Thompson, 563 U.S. 51, 60 (2011) (citing Monell, 436 U.S. at 692). Indeed, "it is only when the governmental employees' 'execution of a government's policy or custom . . . inflicts the injury' and is the 'moving force' behind the constitutional violation that a municipality can be liable." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 25 (1st Cir. 2005) (omission in original) (quoting Monell, 436 U.S. at 694). Thus, the "two basic elements" of the inquiry are whether Lavigne's "harm was caused by a constitutional violation" and

- 14 -

whether the municipal entity, in this case the Board, can be held "responsible for that violation." Id. at 25-26. We address only the second element because if Lavigne has failed to allege facts sufficient to show that Great Salt is in some way responsible for any constitutional violation, there can be no municipal liability. Under that element, as relevant here, a plaintiff must show either the existence of a municipal policy or custom directing or requiring the allegedly unconstitutional actions or that the municipality ratified the alleged actions of a subordinate after the fact. See Welch v. Ciampa, 542 F.3d 927, 941-42 (1st Cir. 2008).

On appeal, Lavigne argues that the district court erred in dismissing her claim because (1) her allegations sufficiently establish the existence of a policy or custom of withholding; (2) the district court erred in declining to address the first element of municipal liability; and (3) her allegations established that the Board violated her right to direct the education of her child. Like the district court, we resolve this case by addressing only the second element of municipal liability, concluding that Lavigne's allegations fail to plausibly show that either the Board had a policy of withholding or that the Board

later ratified the individual defendants' decisions to withhold information from Lavigne.[4]

### A. Structure of __Monell__ Liability Analysis

We begin by addressing Lavigne's contention that the district court erred in beginning -- and ending -- its analysis with the second element of municipal liability.  Lavigne has not directed our attention to a single case requiring a district court to begin its municipal liability analysis with the constitutional question, nor are we aware of any such cases.  Indeed, our case law indicates that the opposite is true.  See Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (affirming dismissal of complaint against city solely because "[t]he

---

[4] During the pendency of this appeal, this court released our decision in Foote v. Ludlow Sch. Comm., 128 F.4th 336 (1st Cir. 2025) (per curiam).  In that case, we addressed a similar claim involving parental rights protected by the Due Process Clause, concluding that a school's admitted policy of withholding from parents a student's decision to "go by a different name and to use different pronouns than those given to them at birth" did not "restrict any fundamental parental right protected by the Due Process Clause." Id. at 340, 355-56.  Following that decision, we ordered supplemental briefing from the parties in this case to address Foote's impact on their arguments.  Lavigne contended that Foote was not controlling despite the similarities.  For its part, the Board maintained that Foote need not be considered because, unlike in Foote, there was no policy of withholding alleged here. The Board also contended that if we were to disagree and conclude that Lavigne's complaint satisfied the second element of municipal liability, Foote would be controlling as to the question of whether defendants violated Lavigne's constitutional rights.  Because we agree with the Board that Lavigne's complaint does not satisfy the second element of municipal liability, we need not consider Foote's applicability to this case.

- 16 -

complaint . . . references no state or local laws establishing the policymaking authority of any individual or group of individuals" and "gives no guidance about which acts are properly attributable to the municipal authority"); Collins v. City of Harker Heights, 503 U.S. 115, 123 (1992) (in municipal liability case, assuming constitutional violation and addressing second element); see also Sony BMG Music Ent. v. Tenenbaum, 660 F.3d 487, 511 (1st Cir. 2011) ("It is bedrock that the 'long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" (quoting Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988))). Accordingly, we see no error in the district court's decision to address only the second element, and we do the same ourselves.

Thus, we turn to whether Lavigne's allegations demonstrate either: (1) the existence of an unwritten policy of withholding information about students' gender identity and gender expression from parents or (2) that the Board later ratified the individual defendants' decisions to withhold such information from Lavigne.[5]

---

[5] Before the district court, in addition to arguing the existence of an unwritten policy or custom and liability via ratification, Lavigne argued that defendants' acts stemmed from a persistent practice of failing to properly train staff on the rights of parents. But the district court rejected this argument, concluding that the allegations only suggested an insufficient

- 17 -

### B. <u>Monell</u>'s Second Element: Policy or Custom of Withholding

At this stage of litigation, with respect to the second element of municipal liability, a plaintiff must plausibly allege that the "municipal action at issue . . . constitute[s] a 'policy or custom' attributable to" the municipality, that "the municipal policy or custom actually . . . caused the plaintiff's injury," and "the municipality possessed the requisite level of fault." <u>Young</u>, 404 F.3d at 26.  Here, we begin -- and end -- our inquiry with the question of whether Lavigne has plausibly alleged the existence of any policy or custom at all.

An official municipal policy can take the form of either an "officially adopted" policy statement or regulation, <u>Monell</u>, 436 U.S. at 690, or an informal custom amounting to a widespread practice that, although "not authorized by written law," is "so permanent and well settled as to constitute a 'custom or usage' with the force of law," <u>Abdisamad</u>, 960 F.3d at 60 (quoting <u>Monell</u>, 436 U.S. at 691).  The Supreme Court has also held that if "authorized policymakers approve a subordinate's decision and the basis for it," that ratification is chargeable to the municipality as an official policy or custom "because their decision is final." <u>City of St. Louis</u> v. <u>Praprotnik</u>, 485 U.S. 112, 127 (1988)

---

training program, which was not enough to establish liability. Lavigne has not advanced this theory in her opening brief, so, to the extent she seeks to raise that argument on appeal, it is waived.  <u>See</u> <u>Mayendía-Blanco</u>, 905 F.3d at 32.

- 18 -

(plurality opinion); see Connick, 563 U.S. at 61 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.").

Lavigne argues that she has satisfied Monell's policy or custom requirement by alleging facts that compel the inference that (1) an unwritten but official policy or custom of withholding existed or (2) the Board ratified the individual defendants' choices to withhold information from her. We reject these contentions and thus conclude that Lavigne has not pleaded facts sufficient to establish the existence of a permanent and well-settled policy or custom of withholding and concealing information.

### 1. Unwritten Policy or Custom

In support of the first theory, Lavigne directs our attention to various statements from the Board and school officials defending the legality of defendants' conduct, arguing that each denial of wrongdoing compels the inference that the Board did indeed maintain a policy of withholding information from parents. Specifically, Lavigne argues that because Superintendent Johnston told Lavigne that "no policy was violated" by the defendants' actions, "the logical conclusion is that the[] actions were the policy." Lavigne cites the Board's January 14, 2023 statement

that "[n]either the Board nor school administration are aware of any violation of policy or law [that] requires further action at this time" as supporting the same inference. She also points to Principal Schaff's February 26, 2023 statement attributing recent threats against the school to "[a] misunderstanding of [the] laws pertaining to gender identity and privileged communication between school social workers and minor clients," which Lavigne says amounts to a statement that defendants' conduct was consistent with school policies. Finally, she alleges that social worker Roy's conduct violated written school policies and yet the Board decided to renew his contract, arguing that the "obvious explanation" for this decision is that Roy's conduct complied with an unwritten policy of withholding.

However, none of these allegations support the inference that the Board maintained an unwritten custom or policy of withholding information from parents. As Lavigne herself emphasizes, the Board's written policies encourage the opposite: the Guidelines state that "[a] plan should be developed by the school, in consultation with the student, parent(s)/guardian(s) and others as appropriate, to address the [transgender] student's particular needs," and the Staff Conduct Policy prohibits "[a]sking a student to keep a secret." But Lavigne argues that defendants' alleged misconduct "should amount to violations" of these policies. In other words, Lavigne concedes that the Board

maintained written policies that apply to the conduct in question. Common sense thus dictates that it was these written policies to which the Board and school officials were referring in the statements cited by Lavigne.

Contrary to Lavigne's contentions on appeal, there need not have been some superseding unwritten custom of active concealment for the Board and school officials to conclude that the alleged misconduct did not run afoul of the Board's existing written policies. While the Guidelines state that school personnel "should" consult with parents "as appropriate" in addressing the needs of transgender students, they also expressly note that they are to be "interpreted in light of applicable federal and state laws and regulations." This would include the Maine state law protecting the confidentiality of communications between students and school social workers, Me. Rev. Stat. Ann. tit. 20-A, § 4008, which both the Board and Principal Schaff cite in their statements alluding to the issues raised by Lavigne. Defendants' repeated references to the protections provided to student and counselor relationships under state law suggest that they interpreted state law to either support the individual defendants' alleged decision to withhold information from Lavigne or believed there was enough ambiguity to make it unclear whether that decision violated Board policy. Indeed, Lavigne acknowledged that it is not entirely clear whether the actions of the individual defendants would violate the

Board's express policies when she correctly alleged that the Guidelines do not explicitly address "the giving of chest binders or any other devices to students," nor do they affirmatively "mandate the involvement of parents at any point in the process of deciding whether to use alternate names and pronouns."

"We have explained that assessing plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 270 (1st Cir. 2022) (quoting Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 53 (1st Cir. 2013)). Here, there are "obvious alternative explanation[s]," id. (quoting Twombly, 550 U.S. at 567)), for Superintendent Johnston's statement to Lavigne that "no policies had been violated" and the similar sentiments expressed in the Board's January 14, 2023 statement that belie the suggestion of an unwritten policy of withholding. The same is true for the school's decision to renew Roy's contract. We likewise see no basis to infer the existence of an unwritten withholding policy from the statement Principal Schaff addressed to the wider school community in response to threats to the school, which provides only a general summation of relevant "laws pertaining to gender identity and privileged communication between school social workers and minor clients" and makes no reference to any policies and practices of the school. Finally, nothing about the staff's conduct itself allows for the

- 22 -

inference that they were acting pursuant to a known and well-settled policy.[6]

Without this factual support, Lavigne's contention that the school acted pursuant to an unwritten "blanket policy, pattern, and practice of intentional withholding and concealment of such information from all parents" is based solely on her "information and belief." But the phrase "information and belief" does not excuse "pure speculation," Menard, 698 F.3d at 45, and a "legal conclusion couched as a factual allegation" is not entitled to a

---

[6] In addition to the actions of social worker Roy, Lavigne also alleges that other "school officials had been calling A.B. by a name not on A.B.'s birth certificate and were referring to A.B. with gender-pronouns not typically associated with A.B.'s biological sex" and did not inform Lavigne of these facts. At times, where there is other evidence of a custom or policy, concerted actions by municipal employees may provide "some proof of the existence of the underlying policy or custom." See Bordanaro v. McLeod, 871 F.2d 1151, 1157 (1st Cir. 1989). However, Lavigne has not pled any facts to suggest that these officials intentionally withheld information from her, encouraged A.B. to do so, or were even aware of Lavigne's lack of involvement in the school's treatment of her child. And given the lack of any other indicia of a custom or policy as explained above, these meager pleadings, which ultimately suggest only the isolated actions of one employee, do not allege a "well settled and widespread" practice of withholding information from parents. Cf. id. at 1156 (noting that all involved "acted in concert" in determining that plaintiff had established existence of a policy); see also Thomas v. Neenah Joint Sch. Dist., 74 F.4th 521, 524-25 (7th Cir. 2023) (affirming dismissal of Monell claim where "allegations of two isolated incidents fail[ed] to plausibly allege that the [school district] ha[d] a widespread practice of using excessive force to punish students with behavioral disabilities").

- 23 -

presumption of truth, <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 555).[7]

## 2. Board Ratification

Lavigne also contends that regardless of whether the Board maintained a policy of withholding, it is liable based on its later ratification of the individual defendants' choices to withhold information from Lavigne.  We disagree.

"[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."  <u>Welch</u>, 542 F.3d at 942 (quoting <u>Pembaur</u> v. <u>City of Cincinnati</u>, 475 U.S. 469, 480 (1986)).  Where "authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is] chargeable to the municipality because their decision is final." <u>Praprotnik</u>, 485 U.S. at 127.  Although this court has yet to fully delineate the "precise contours of this ratification doctrine," we have explained the requirement that municipal approval must be active, not passive.  <u>Saunders</u> v.

_____

[7] To the extent Lavigne suggests that discovery will reveal the necessary facts, we note that, given the complaint's shortcomings, discovery would be nothing more than "a fishing expedition." <u>DM Rsch., Inc.</u> v. <u>Coll. of Am. Pathologists</u>, 170 F.3d 53, 55 (1st Cir. 1999) ("Conclusory allegations in a complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition.").  Further, Lavigne's suggestion underscores that her allegations of the existence of a policy are unsupported by facts and thus are based on "pure speculation." <u>Menard</u> v. <u>CSX Transp., Inc.</u>, 698 F.3d 40, 44 (1st Cir. 2012).

Town of Hull, 874 F.3d 324, 330 (1st Cir. 2017).  We have also explained that the active approval must be with respect to both the "subordinate's decision and the basis for it."  Id. (emphasis omitted) (quoting Praprotnik, 485 U.S. at 126).  And, as the Supreme Court set out in Praprotnik, "[s]imply going along with [a subordinate's] discretionary decisions" or "mere[ly] fail[ing] to investigate the basis of a subordinate's discretionary decisions" does not equal ratification.  485 U.S. at 130.

Lavigne relies primarily on the Board's January 14 statement that it was unaware of any policy violation requiring further action, arguing that from this statement one can "reasonabl[y] infer[] that the Board ratified the challenged conduct."  She also points to the Board's decision to approve a second contract for Roy, arguing that by doing so the Board ratified Roy's conduct.

We agree with the district court that the Board's "vague expression" does not "identify[] any particular decision or decisions of a subordinate" and thus does not plausibly show that the Board ratified the individual decisions to not tell certain information about A.B. to Lavigne.  Nothing in the Board's statement expressed approval for any of the alleged conduct or any reasoning behind it.  The statement only explained that no policy was violated.  This is nothing like the type of actively approving statement that the Praprotnik Court considered as the basis for

ratification.  And, moreover, Lavigne has not pointed us to any cases, nor are we aware of any, that extended Praprotnik's holding to vague statements like the one made by the Board here.  Nothing about the Board's decision to grant Roy another contract, without more, expresses active approval of Roy's alleged conduct with respect to A.B. and Lavigne.  Accordingly, we agree with the district court that Lavigne has failed to plausibly allege that the Board's "'execution of a [municipal] policy or custom . . . inflict[ed] the [alleged] injury' and [was] the 'moving force' behind the constitutional violation." Young, 404 F.3d at 25 (omission in original) (quoting Monell, 436 U.S. at 694).

## IV. Conclusion

For these reasons, we **affirm** the dismissal.